IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-00229-01-CR-W-ODS |
| | ) | |
| DAMON E. GOODRICH, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Damon E. Goodrich's Motion to Suppress (doc #29). For the reasons set forth below, it is recommended that this motion be granted in part and denied in part.

I. INTRODUCTION

On August 10, 2010, the Grand Jury returned a one count indictment against Damon E. Goodrich. The indictment charged that on May 21, 2009, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, possessed two firearms, a Ruger, Model P94, .40 caliber pistol, and a Ruger, Model P95, 9mm pistol, both of which had been transported in interstate commerce.

Defendant Goodrich was arrested and initially appeared before this court on April 1, 2011.

On May 23, 2011, the Grand Jury returned a three count superseding indictment against defendant Goodrich. Count One of the superseding indictment charges that on May 21, 2009, defendant, having been convicted of a crime punishable by imprisonment for a term exceeding one year, possessed two firearms, a Ruger, Model P94, .40 caliber pistol, and a Ruger, Model P95, 9mm pistol, both of which had been transported in interstate commerce. Count Two charges that on May 21, 2009, defendant knowingly possessed with intent to distribute less than 50 kilograms of marijuana. Count Three charges that on May 21, 2009, defendant knowingly possessed the two firearms listed in Count One in furtherance of a drug trafficking crime, that is, possession with intent

to distribute marijuana, as alleged in Count Two.

On August 16, 2011, the undersigned conducted an evidentiary hearing on the motion to suppress. Defendant Goodrich was represented by retained counsel, Wainsworth Anderson. The Government was represented by Assistant United States Attorneys Paul Becker and Sara Holzschuh. The Government called Officer Wesley Raab, Sergeant Jason Rusley, Officer Michael Delaney, Officer Terrence Owens, Detective Darryl Ward and Detective Erica Pfeifer of the Kansas City, Missouri Police Department as witnesses. Defendant Goodrich testified on behalf of the defense.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On the evening of May 21, 2009, Officers Wesley Raab, Terrence Owens and Michael Delaney of the Kansas City, Missouri Police Department were on patrol on the night shift. (Tr. at 3, 32, 39)

2. At about 10:50 p.m., officers were dispatched to East 58th Terrace concerning a disturbance with a weapon. (Tr. at 3) Officers Owens, Delaney and Raab arrived at 3910 East 58th Terrace at the same time (Tr. at 4, 32-33) or within minutes of each other. (Tr. at 41)

3. The first call concerning the disturbance was anonymous. (Tr. at 40) However, as soon as officers arrived on the scene, a neighbor, Carl Harris, flagged them down. (Tr. at 40, 52) Mr. Harris advised the officers that he observed a blue vehicle drive down the street. (Tr. at 40) Two males wearing hoodies got out of the car, ran into the house and then a man ran outside the house. (Tr. at 40) Mr. Harris told the officers that at some point, he heard one gunshot. (Tr. at 41)

4. After talking to Carl Harris, Officers Owens and Delaney "held the air," meaning that unless it was an absolute emergency, the radio air traffic was for them. (Tr. at 41)

5. Officers Owens and Delaney advised Officer Raab that they saw two people in the house. (Tr. at 4) The three officers made a quick perimeter around the house. (Tr. at 4, 33, 41)

6. Officer Raab took the front of the house at 3910 East 58th Terrace. (Tr. at 5) Officers Delaney and Owens had the north, or back side, of the house. (Tr. at 33-34, 41) As Officer Owens was watching the back door, he could see people moving around inside the house. (Tr. at 42) Officer Owens heard a loud noise and observed a man running out of the back of the house carrying what appeared to be narcotics. (Tr. at 42) Officer Owens yelled at the man, "Stop! Police!" and pursued him into the woods. (Tr. at 42) About ten feet into the woods, Officer Owens lost sight of the man and looked down and saw the drugs the man had been carrying and two

handguns. (Tr. at 42) Officer Delaney also chased the man into the woods. (Tr. at 34)

7. After chasing the man into the woods, the officers heard the crashing through the brush stop. (Tr. at 34) In Officer Delaney's experience, this means the person has lain down somewhere. (Tr. at 34) Therefore, the officers waited for a K-9 officer to come to search for the suspect. (Tr. at 34)

8. When Officer McGruder, the K-9 officer, arrived, he took over the search and Officer Owens exited the woods. (Tr. at 43) The dog picked up the scent, and the person, later identified as Gary Grandberry, was arrested and taken into custody. (Tr. at 35)

9. Sergeant Jason Rusley, who has been with the Kansas City, Missouri Police Department for sixteen years and a sergeant for six years, was supervising five to six officers on the evening of May 21, 2009. (Tr. at 20) When the call for service at East 58th Terrace was received, he was close to the area and responded. (Tr. at 20-21) When Sergeant Rusley arrived, no officers were positioned in front of the residence so he took a position next to the air conditioner at the front of the house. (Tr. at 21) Sergeant Rusley was aware from the radio traffic that a male had run out the backdoor of the house. (Tr. at 22) Officer Owens had described the party as armed and advised that officers had found a couple of weapons hidden in the back yard. (Tr. at 22) Shortly after Sergeant Rusley reached the corner of the house, he observed another party breaking out a window on the east side of the house. (Tr. at 23) Once the party made it to the point where he could not crawl back inside the window, Sergeant Rusley deployed his taser. (Tr. at 23) The individual, who was arrested, handcuffed and taken into custody, was later identified as Timothy McDaniel. (Tr. at 23-24)

10. Witnesses were advised to stay back until the house was safe. (Tr. at 7) Eventually, Officer Owens made contact with Damon Goodrich at the front of the house. (Tr. at 44)

11. A protective sweep of the house was organized because Carl Harris had told the officers that he had heard a gunshot inside the house. (Tr. at 44) The police did not know if there was a victim inside the house who might be injured or in need of medical assistance. (Tr. at 44-45) Police also did not know whether there were other armed parties barricaded in the house. (Tr. at 45) Thus, a determination was made that the house would be cleared to ensure there were no victims or other armed parties. (Tr. at 45)

12. Once more officers arrived, Officers Raab and Owens tried to find a way into the house from the back door, but were unable to make entry because of clutter. (Tr. at 7, 46) Defendant Goodrich testified that the officers asked him to open the front door and he initially refused saying that their services were no longer needed. (Tr. at 93) According to Goodrich, one of the officers told him that if he did not open the door, they would bust it open. (Tr. at 94) Officer Owens testified that because a shot had been fired in the house, officers would have forced entry into the house if the owner had not opened the door. (Tr. at 61-62) Goodrich unlocked the front door and Officers Raab, Minor and Owens made entry into the house. (Tr. at 7, 46)

13. Upon entry, the officers announced "Police Department." (Tr. at 46) First, the front

room was cleared. (Tr. at 7) One officer remained in the front room and Officer Raab went into the east bedroom with Officer Owens and cleared it. (Tr. at 7) By "clearing the room," officers look to make sure no other armed suspects are in the room. (Tr. at 7, 46-47) In this case, officers were also looking for victims. (Tr. at 48) After the bedroom was cleared, Officer Raab stood by the door until he was told he was no longer needed. (Tr. at 18) The purpose of standing by a door in a room that has been cleared is to make sure officers have not missed someone who could come out to assault the officers. (Tr. at 18-19) In this house, there was a lot of stuff on the floors and blankets where people could hide. (Tr. at 8)

14. The protective sweep took twenty to twenty-five minutes. (Tr. at 48) It was a slow search to make sure no one else was in the house. (Tr. at 8, 46) Officer Raab testified that by the time the officers made entry into the house, it had been a while and suspects could have hidden pretty much anywhere. (Tr. at 8) Officers looked under beds and in closets where a person could have hidden. (Tr. at 8, 48) Officers searched the basement as well. (Tr. at 47)

15. Once the house was cleared, Officer Raab exited the house and waited until Officer Owens and Sergeant Rusley decided what to do next. (Tr. at 8) Sergeant Rusley was responsible for finding out what kind of charges would be brought and contacting the detectives to follow up on the investigation. (Tr. at 25) Initially, Sergeant Rusley thought he had a burglary in progress so he called the property crimes detective who was on call, Detective Ward. (Tr. at 26) Detective Ward was the first detective to respond to the scene. (Tr. at 26) Sergeant Rusley also called Detective Roeder from the Drug Enforcement Unit after narcotics were found during the protective sweep of the property. (Tr. at 26)

16. During the protective sweep of the house, officers observed a weapon sitting on a bed. (Tr. at 48) In another bedroom, officers saw a diaper box containing individually wrapped baggies of marijuana. (Tr. at 48) The open diaper box was sitting by a closet. (Tr. at 61)

17. When Detective Ward arrived he was told what had been observed in the residence. (Tr. at 50) Detective Ward determined that the officers would need to get either a consent to search or a search warrant for the residence based on what they had seen in the protective sweep. (Tr. at 50, 65)

18. Detective Ward testified that Damon Goodrich came up to him and told him that he (Goodrich) wanted the two suspects arrested because they had broken into his residence. (Tr. at 67) However, in response to Detective Ward's questions, Goodrich indicated that he did not live at the residence. (Tr. at 67) Nevertheless, when Detective Ward checked Goodrich in the computer, Goodrich's name came back to that address. (Tr. at 67) Detective Ward also looked in the mailbox and saw utility bills in Damon Goodrich's name. (Tr. at 67) Detective Ward then asked Goodrich if he was sure he did not live at the residence. (Tr. at 67) At that point, Goodrich admitted that he lived there and that it was his house. (Tr. at 67) After this conversation, Detective Ward told Goodrich that because of what the officers had seen inside the house, they were going to need to search it and asked Goodrich for permission to search the house. (Tr. at 67) Government's Exhibit 1, a Kansas City, Missouri Police Department Consent to Search form, was signed by Damon Goodrich and witnessed by Officer Owens. (Tr. at 49-50) The form read in part:

> I, _Goodrich, Damon E B/M 8/27/72_ freely and voluntarily give my consent to members of the Kansas City, Missouri Police Department to conduct a search of: _contents of listed residence 3910 E 58th Terr_ and seize any person, property, item, or substance determined by the Kansas City, Missouri Police Department to be relevant either to the matter under investigation or any criminal matter. I further authorize the taking of photographs and the making of video recordings and sketches of the property, items, substance or areas being searched.
>
> I understand that the Police Department has not obtained a search warrant authorizing this search and that I have a constitutional right to refuse permission to conduct the requested search. I also understand that any evidence found as a result of the search may be used against me in court.

(Government's Ex. 1)

19. Detective Ward stated that when he initially asked defendant Goodrich if he would sign the consent to search, Goodrich asked what would happen if he did not sign the consent form. (Tr. at 66) Detective Ward told Goodrich that the officers would then just get a search warrant. (Tr. at 66-67) Detective Ward did not tell Goodrich that he would be angry if Goodrich made the officers wait for a search warrant. (Tr. at 66) Detective Ward testified that Goodrich did not at any point refuse to sign the consent form.[1] (Tr. at 66) Detective Ward testified that he did not threaten Goodrich. (Tr. at 66) Goodrich was not in custody at the time he gave consent to search.[2] (Tr. at 60, 69) Goodrich did not appear to be under the influence of drugs or alcohol. (Tr. at 74) Goodrich was 36 years old.[3] (Indictment) Goodrich graduated from high school and attended Penn Valley Community College for one semester. (Tr. at 110) Goodrich had previously been arrested several times and had two prior felony convictions for drugs and unlawful use of a weapon. (Tr. at 103-04) An officer read the consent to search form out loud to Goodrich before he signed it. (Tr. at 73, 75) Goodrich admitted that he read the form before he signed it and that he understood the wording on the form. (Tr. at 110-11) Goodrich did not object as the officers searched the residence. (Tr. at 106)

---

[1] Defendant Goodrich testified that he initially refused to sign a consent, but the detective pulled him aside and told him that if the officers had to wait around to obtain a search warrant, they would be angry. (Tr. at 97) Goodrich further testified that the detective told him that if he allowed the officers to search now, they would not tear the house up. (Tr. at 97) The Court finds this testimony contradictory to that of Detective Ward who testified that Goodrich did not at any point refuse to sign the consent form. (Tr. at 66) Further, Detective Ward denied telling Goodrich that the officers would be angry if they had to wait for a warrant. (Tr. at 70) The Court finds the testimony of Detective Ward more credible than that of defendant Goodrich.

[2] Defendant Goodrich testified that he was handcuffed and taken into custody after the protective sweep of the house, prior to signing the consent form. (Tr. at 95-96) Officer Owens and Detective Ward testified that Goodrich was not handcuffed, nor in custody when he signed the consent form. Again, the Court finds the testimony of the officers more credible than that of defendant Goodrich.

[3] Defendant Goodrich mistakenly testified that he was 37 years old on May 21, 2009. (Tr. at 103)

5

20. The following items were seized as a result of the search of the residence: a Ruger, .40 caliber pistol; a Ruger, Model P95, 9mm pistol; three large bags containing a green leafy substance; one ballistic vest; .40 caliber 50 bullets; and three scales. (Tr. at 51; Government's Ex. 1) In addition, $24,000.00 in U.S. currency was seized from the residence. (Defendant's Ex. 1)

21. Detective Erica Pfeifer was assigned to the gang squad on May 2, 2009. (Tr. at 78) Detective Pfeifer interviewed defendant Goodrich on the second floor of police headquarters. (Tr. at 78) Goodrich was in custody at the time of the interview. (Tr. at 78) The general procedure for interviews is that the person to be interviewed is escorted by a detective to the second floor. (Tr. at 78) The person is asked background questions from a Detective Investigation Report (DIR). (Tr. at 78) The DIR is a questionnaire that asks basic information such as name, date of birth, height, weight and other general questions. (Tr. at 78) Government's Exhibit 2 is the DIR filled out by Detective Pfeifer when she interviewed Goodrich. (Tr. at 79)

22. At the time Detective Pfeifer was questioning defendant Goodrich she was aware that he had been charged with possession of a firearm and possession of narcotics. (Tr. at 81) Prior to advising Goodrich of his Miranda rights, Detective Pfeifer questioned Goodrich about his address. (Tr. at 81, 83-84) In response to Detective Pfeifer's questions, Goodrich indicated he lived at 3910 East 58th Terrace and that he lived there alone, except when he had his children. (Tr. at 83-84) Detective Pfeifer put this information in a summary of her report, Defendant's Exhibit 2. (Tr. at 83) Detective Pfeifer viewed this as important information in that "he couldn't say that they're somebody else's narcotics or weapons." (Tr. at 83) The report says that Goodrich was given his Miranda rights prior to questioning. (Tr. at 86) The Miranda waiver was not read to Goodrich until after Detective Pfeifer had completed the DIR. (Tr. at 86) Detective Pfeifer does not consider the DIR to be part of questioning; it is "just general practice." (Tr. at 86)

23. Prior to filling out the DIR, Detective Pfeifer did not advise defendant Goodrich of his Miranda rights. (Tr. at 80) After filling out the form, Detective Pfeifer advised Goodrich of his Miranda rights and he refused to sign the form. (Tr. at 80) Goodrich advised that he did not want to talk with the detective until he had talked with his attorney. (Tr. at 80) At that point, the interview was over and Goodrich was escorted back upstairs. (Tr. at 80)

### III. DISCUSSION

Defendant Goodrich seeks suppression of the following:

a) All evidence seized during the warrantless search of 3910 E. 58th Terrace, Kansas City, MO 64130 conducted on May 21, 2009.

b) All evidence seized because of Defendant's coerced consent.

c) All evidence seized from the Defendant by a search warrant obtained with the tainted evidence from the warrantless searches.

d) All statements made by the Defendant during the Detective Investigative Report because the Defendant was interrogated after the Defendant asked for an attorney.

6

(Motion to Suppress (doc #29) at 1)  Defendant also seeks to quash the arrest warrant because "the probable cause used to obtain the arrest warrant was based on the tainted evidence obtained from the illegal search."  (Id. at 5)  The Court will address each of defendant's arguments.

      A.      Protective Sweep

The Fourth Amendment protects the home from warrantless searches and seizures.  See United States v. Dunn, 480 U.S. 294, 300 (1987).  However, an exception to this protection occurs when police officers are presented with exigent circumstances.  See Payton v. New York, 445 U.S. 573, 590 (1980); United States v. Antwine, 873 F.2d 1144, 1146 (8th Cir. 1989).  Exigent circumstances exist "[w]here, in circumstances beyond the officers' control, lives are threatened, a suspect's escape is probable, or evidence is about to be destroyed."  See United States v. Parris, 17 F.3d 227, 229 (8th Cir.), cert. denied, 511 U.S. 1077 (1994).  See also Antwine, 873 F.2d at 1147 ("legitimate concern for the safety of individuals may constitute 'exigent circumstances' justifying warrantless entries and searches").

In the case before this Court, at about 10:50 p.m. on May 21, 2009, officers were dispatched to 3910 East 58th Terrace concerning a disturbance with a weapon.  (See Fact Nos. 1 and 2, supra)  When they arrived at the scene, the officers were flagged down by Carl Harris who advised that he had observed a blue vehicle drive down the street, two males wearing hoodies get out of the car and run into the house and another man ran run outside the house.  (See Fact No. 3, supra)  Mr. Harris told the officers that he heard a gunshot.  (Id.)  The officers made a perimeter around the house and observed people moving around inside the house.  (See Fact Nos. 5 and 6, supra)  One man ran from the back side of the house into the woods carrying what appeared to be narcotics.  (See Fact No. 6, supra)  Officers pursued the man into the woods and found the drugs the man had been carrying and two handguns.  (Id.)  This man was arrested after a K-9 officer took over the search.  (See Fact No. 8, supra)  A second man was arrested as he was crawling out a window on the east side of the house.  (See Fact No. 9, supra)  A protective sweep of the house was organized because Carl Harris told the officers that he had heard a gunshot inside the house.  (See Fact No. 11, supra)  The police did not

7

know if there was a victim inside the house who might be in need of medical assistance or whether there were other armed parties barricaded in the house. (Id.)

The Court finds that the officers were justified in entering the residence without a warrant because they could reasonably have believed that there might be a victim inside the house in need of medical assistance or another armed party barricaded in the house based on the gunshot fired, the parties running from the house and the guns recovered. The Court finds the testimony of Officer Owens credible that the officers were searching the house for possible victims and/or suspects. The scope of the officers' warrantless search did not exceed what was necessitated by the exigency. See United States v. Antwine, 873 F.2d 1144, 1147 (8th Cir. 1989). The officers seized nothing. Based on the exigent circumstances present in this case, the officers were not required to obtain a search warrant before searching the residence for possible victims and/or suspects. There was no constitutional violation.

B.   Defendant's Consent to Search

Another exception to the protection against warrantless searches and seizures occurs where proper consent has been voluntarily given. See United States v. Matlock, 415 U.S. 164, 165-66 (1974). The government bears the burden of proving that consent was voluntarily given. See United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006), cert. denied, 549 U.S. 1292 (2007). The test in reviewing a consent search is whether, in the totality of the circumstances, the consent was given voluntarily and without coercion. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). In United States v. Willie, the court set forth the following guidance in judging the voluntariness of a defendant's consent:

> Our case law offers a catalogue of factors to consider in judging the voluntariness of a defendant's consent to search. Some relate to the characteristics and behavior of the defendant, such as the defendant's age, intelligence and education, knowledge of his constitutional rights (whether from *Miranda* warnings in the encounter at issue or from previous interactions with police), whether he was under the influence of drugs or alcohol, and whether he objected to the search or stood by silently as it was occurring. ... Others relate to the environment surrounding the defendant at the time he gave his consent, such as whether he was in custody or under arrest and whether he was in a public or secluded place. ... Still others relate to the interaction between police and the defendant in the encounter, such as whether

> police officers detained and questioned the defendant for a long time before obtaining his consent, whether they threatened, physically intimidated, or punished him, and whether they made promises or misrepresentations upon which the defendant relied in giving his consent. ... No one factor is dispositive; they are merely tools for analyzing the "totality of all the circumstances." ...

462 F.3d at 896 (citations omitted).

In this case, Detective Ward testified that the consent to search form was read out loud to defendant Goodrich. (See Fact No. 19, supra) Defendant Goodrich admitted that he read the form before he signed it and that he understood the wording on the form. (Id.) The form stated: "I understand that the Police Department has not obtained a search warrant authorizing this search and that I have a constitutional right to refuse permission to conduct the requested search." (See Fact No. 18, supra) Detective Ward did not threaten Goodrich to obtain his consent to search. (See Fact No. 19, supra) Goodrich was not in custody at the time he gave consent to search. (Id.) Goodrich did not appear to be under the influence of drugs or alcohol. (Id.) Goodrich was 36 years old, had graduated from high school and had attended Penn Valley Community College for one semester. (Id.) Goodrich had experience with law enforcement in that he had previously been arrested several times and had two prior felony convictions for drugs and unlawful use of a weapon. (Id.) Goodrich did not object as the officers searched the residence. (Id.) While Detective Ward did advise Goodrich that because of what the officers had seen inside the house, they were going to need to search it (see Fact No. 18, supra), the Court views this as an explanation as to why Detective Ward was asking Goodrich for permission to search the house, rather than intimidation. No credible evidence was presented that defendant Goodrich was coerced, intimidated or incapacitated in any way when he signed the Consent to Search form.

Based on the evidence outlined above, the Court finds that defendant Goodrich was advised of his rights and that he voluntarily and intentionally waived those rights and consented to a search of his house. The Government has met its burden in establishing that defendant's consent to search was freely and voluntarily given and not the result of duress or coercion.

C. <u>Search Warrant</u>

Defendant Goodrich argues that the search warrant for a buccal swab for DNA analysis was obtained using the tainted evidence from the warrantless searches. Given the Court's findings above that the protective sweep of the residence and the consensual search of the residence were proper, there is no basis for suppression of the search warrant.

D. Defendant's Statements

Defendant Goodrich seeks suppression of "[a]ll statements made by the Defendant during the Detective Investigative Report because the Defendant was interrogated after the Defendant asked for an attorney." (Motion to Suppress (doc #29) at 1) Defendant set forth his argument in more detail as follows:

> ... In this case, the Defendant was interrogated even after he refused to wave [sic] his Miranda rights and asked for an attorney. The Defendant was asked who lived with him. Allegedly, the Defendant answered that he lived at the house alone except when he has custody of his two children, ages 9 and 6.
>
> The Defendant's answer is testimonial communication, because the government may use his answer in its quest to establish possession of the gun found inside the house. The Defendant's Fifth Amendment rights were violated because he asked for a lawyer and did not waive his Miranda rights. Because the Defendant's Fifth Amendment rights were violated, the statements should be suppressed.

(Id. at 7)

The evidence presented at the hearing does not support defendant's argument that he was interrogated after he asked for an attorney. Rather, the interview ceased after defendant advised that he did not want to talk with the detective until he had talked with his attorney. (See Fact No. 23, supra) However, the pertinent statement defendant wishes to suppress, that is that defendant lived at the house alone except when he had custody of his two children, was obtained as a result of a custodial interrogation that took place prior to the administration of Miranda warnings and prior to defendant stating that he did not want to talk with the detective until he had talked with his attorney. (See Fact Nos. 22 and 23, supra) The issue is whether this statement is nonetheless admissible pursuant to the "routine booking question" exception to the Miranda rule, which "exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services." Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990). In United States v. Vasquez,

10

2003 WL 356026 (D. Me. Apr. 16, 2003), the court examined the routine booking question exception:

> As the Supreme Court has observed, "recognizing a 'booking exception' to <u>Miranda</u> does not mean, of course, that any question asked during the booking process falls within that exception." [<u>Muniz</u>, 496 U.S.] at 602 n.14 (citations and internal punctuation omitted). "Without obtaining a waiver of the suspect's <u>Miranda</u> rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." <u>Id.</u> (citations and internal quotation marks omitted).
>
> Although the exception is "phrased in terms of the officer's intention, the inquiry into whether [it] is thus inapplicable is actually an objective one: whether the questions and circumstances were such that the officer should reasonably have expected the question to elicit an incriminating response." <u>United States v. Reyes</u>, 225 F.3d 71, 76-77 (1st Cir. 2000). As the First Circuit has further elucidated:
>
>> [W]e think that it would be a rare case indeed in which asking an individual his name, date of birth, and Social Security number would violate <u>Miranda</u>. We can imagine situations, of course, that would present a closer case than this one. For example, asking a person's name might reasonably be expected to elicit an incriminating response if the individual were under arrest for impersonating a law enforcement officer or for some comparable offense focused on identity; likewise, asking an individual's date of birth might be expected to elicit an incriminating response if the individual were in custody on charges of underage drinking; and questions about an individual's Social Security number might be likely to elicit an incriminating response where the person is charged with Social Security fraud. In such scenarios, the requested information is so clearly and directly linked to the suspected offense that we would expect a reasonable officer to foresee that his questions might elicit an incriminating response from the individual being questioned. In contrast, the appellant here was being booked on charges of participating in a criminal drug conspiracy, to which his name, date of birth, and Social Security number bore no direct relevance.
>
> <u>Id.</u> at 77.

2003 WL 356026 at *3.

In this case, at the time Detective Pfeifer was questioning defendant Goodrich she was aware that he had been charged with possession of a firearm and possession of narcotics. (<u>See</u> Fact No. 22, <u>supra</u>) Prior to advising Goodrich of his <u>Miranda</u> rights, Detective Pfeifer questioned Goodrich about his address and who lived there with him. (<u>Id.</u>) In response to Detective Pfeifer's questions, Goodrich indicated he lived at 3910 East 58th Terrace and that he lived there alone, except when he had his children. (<u>Id.</u>) Detective Pfeifer testified that she viewed this as important information in

11

that "he couldn't say that they're somebody else's narcotics or weapons." (Id.)

Given the charges of possession of a firearm and possession of narcotics and that these items had been recovered from defendant Goodrich's home, the Court finds that a reasonable detective would have anticipated that a pre-Miranda background question about who resided in the home with the defendant might elicit an incriminating response. Therefore, the routine booking question exception to the Miranda rule does not apply. Defendant's statement that he lived at the house alone except when he had custody of his two children must be suppressed.

    E.    Arrest Warrant

Finally, defendant argues that he "was arrested approximately on May 21, 2009," and he seeks to quash the arrest warrant because "the probable cause used to obtain the arrest warrant was based on the tainted evidence obtained from the illegal search." (Motion to Suppress (doc #29) at 5) No evidence was presented at the hearing with respect to an arrest warrant.[4] Rather, defendant was apparently arrested at the scene after narcotics and firearms were seized following the search of his residence. Given the Court's findings above that the protective sweep of the residence and the consensual search of the residence were proper and given the lack of any evidence relating to an arrest warrant, defendant's request to quash the arrest warrant must be denied.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order granting in part and denying in part defendant Damon Goodrich's Motion to Suppress (doc #29). The motion should be granted to the extent that it requests that defendant's statement that he lived at the house alone except when he had custody of his two children be suppressed. The remainder of the motion should be denied.

Counsel are reminded they have fourteen days from the date of receipt of a copy of this

---

[4]The Court notes that an arrest warrant was issued for defendant after the grand jury returned an indictment in the instant case.

Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                                                     */s/ Sarah W. Hays*  
                                                                                      SARAH W. HAYS  
                                                                  UNITED STATES MAGISTRATE JUDGE